UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ANTHONY C. APANOVITCH, | ) | CASE NO. 1:22 CV 1946 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| TIM SHOOP, WARDEN, | ) | **AND ORDER** |
| | ) | |
| Respondent. | ) | |

**INTRODUCTION**

Petitioner Anthony Apanovitch was convicted and sentenced to death in an Ohio state court for the aggravated murder and rape of Mary Anne Flynn.[1] Apanovitch's convictions and sentence were affirmed by the Ohio Supreme Court on direct appeal in 1987. *State v. Apanovitch*, 33 Ohio St. 3d 19, 514 N.E.2d 394 (1987). He subsequently filed three unsuccessful petitions for post-conviction relief in state court, all of which were affirmed on appeal. *State v. Apanovitch*, 70 Ohio App. 3d 758, 591 N.E.2d 1374 (1991); *State v. Apanovitch*, 107 Ohio App. 3d 82, 667 N.E.2d 1041 (1995); *State v. Apanovitch*, 113 Ohio App. 3d 591, 681 N.E.2d 961 (1996). Apanovitch filed a petition for habeas corpus in 1991, which this Court denied; that denial was ultimately affirmed by the Sixth Circuit Court of Appeals. *Apanovitch v. Houk*, No. 1:91CV2221, 2009 WL 3378250 (N.D. Ohio Aug. 14, 2009); *Apanovitch v. Bobby*, 648 F.3d 434 (6th Cir. 2011). Following the denial of his first habeas petition, Apanovitch filed a fourth petition for post-conviction relief in State court based on newly-discovered DNA evidence that the State disclosed to him during

---

[1] Apanovitch was also convicted of aggravated burglary; however, that charge is not at issue in this proceeding.

1

discovery in the habeas proceeding. This time, the trial court granted Apanovitch relief and the court of appeals affirmed; Apanovitch was released from death row on bond. *State v. Apanovitch*, 2016-Ohio-2831, 64 N.E.3d 429. However, the Ohio Supreme Court thereafter overturned the trial court and court of appeals and returned Apanovitch to death row. *State v. Apanovitch*, 2018-Ohio-4744, 155 Ohio St. 3d 358, 121 N.E.3d 351. Apanovitch has now filed a second petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentence. (Doc. 1-2).[2] Although this is Apanovitch's second petition for federal habeas relief, the Sixth Circuit pre-authorized the petition, finding it was not successive because the factual predicate for some of his claims arose after the filing of his first habeas petition, in 1991. (Doc. 12). Respondent Warden Tim Shoop has filed a return of writ to the petition, Apanovitch has filed a traverse, and Respondent has filed a sur-reply. (Docs. 20, 21, 22). For the reasons stated below, Apanovitch's petition is DENIED.

## FACTUAL HISTORY

Throughout the long and convoluted series of state and federal appeals following Apanovitch's convictions, the pertinent facts of the case have been summarized numerous times, most recently by the Ohio Supreme Court, in reviewing Apanovitch's fourth petition for post-conviction relief:

> **{¶ 5}** Mary Anne Flynn arrived home on August 23, 1984, at about 10:00 p.m. She owned the house—a duplex—and rented out the other unit. The people in the other unit that night heard Flynn's front door slam soon after she arrived, and they heard more noises (a loud thud and a high-pitched sound) from Flynn's unit between 11:30 p.m. and midnight. No witnesses saw or heard anything after that.

---

[2] For ease of reference, all citations to page numbers of documents filed in the Court's electronic court filing system ("ECF") are to the ECF-assigned page numbers of the individual documents, not to the documents' original page numbers or the ECF "PageID" numbers.

{¶ 6} When Flynn, a nurse, failed to report for her shift at a nearby hospital the next afternoon, a concerned coworker called Flynn's brother. They accessed Flynn's unit that evening and discovered Flynn's body in her bedroom. She was lying face down, naked on the bed with her hands tied behind her back. A bedsheet had been rolled up and was tied around her neck and to the headboard. She had been severely beaten, apparently with a piece of wood broken from a basement windowsill. An autopsy revealed sperm in her mouth and vagina. She had died from asphyxia by cervical compression, i.e., strangulation.

{¶ 7} Soon after the murder, investigators focused on Apanovitch, whom Flynn had hired earlier that summer to paint part of the exterior of her house. Circumstantial evidence suggested that he could be the murderer: There was evidence that Flynn had argued with a man she had hired to paint her house and that Flynn had ended the painting arrangement before the work was finished. Several witnesses testified that Flynn was fearful of a man who had done some painting at her house, and one of those witnesses identified Apanovitch as the person Flynn feared. There was evidence that Apanovitch had approached Flynn outside of her home the afternoon before the murder asking to paint her windowsills. Following that interaction, Apanovitch apparently made sexually suggestive comments about Flynn to a coworker. Also, Apanovitch could not satisfactorily account for his whereabouts or for a scratch that he had received on his face the night of the murder. Finally, based on his blood type, Apanovitch could not be excluded as the source of sperm recovered from Flynn's body.

{¶ 8} Apanovitch was charged with aggravated murder, aggravated burglary, and two counts of rape. The rape counts were identical, both alleging that Apanovitch "unlawfully and purposely engaged in sexual conduct with Mary Anne Flynn not his spouse by purposely compeling [sic] her to submit by the use of force or threat of force."

{¶ 9} After a jury found Apanovitch guilty on all counts, it recommended a death sentence, which the trial court imposed. The court of appeals and this court affirmed the convictions and death sentence.

**B. DNA evidence and testing**

{¶ 10} When conducting Flynn's autopsy, a forensic pathologist with the Cuyahoga County Coroner's office created slides that contained specimens obtained from Flynn's mouth and vagina. DNA testing of the specimens was not available at the time of trial in 1984.

{¶ 11} In 1988, one of Apanovitch's attorneys asked the coroner's office for records related to Flynn's death. At that time, the slides could not be located and it was

3

assumed that they had been lost or destroyed. But in 1991, three slides related to Flynn's case (one vaginal slide and two oral slides) were located.

{¶ 12} In 1991, the coroner's office sent the slides to Forensic Science Associates ("FSA") in California for DNA testing. Due to the condition of the samples, FSA determined that it could not analyze two of the slides (the vaginal slide and one oral slide), but it was able to determine a partial DNA type of the other oral slide (referred to by FSA as "Item 2"). A sample of Apanovitch's DNA was not available to FSA at that time for comparison.

{¶ 13} In 2000, an assistant Cuyahoga County prosecuting attorney asked the Cuyahoga County Coroner to conduct DNA testing on "any trace evidence or samples" related to Flynn's murder. The assistant prosecutor's letter said, "It is the intention of this request that the identity of the donor of sperm found in the victim, Mary Ann [sic] Flynn, be established to the degree of scientific certainty available." By that time, FSA had returned the vaginal and oral slides to the coroner's office. The coroner's office tested the slides in late 2000 but concluded that there was not sufficient material left on them to obtain a clear DNA profile.

{¶ 14} In 2006, for reasons that are not clear from the record, FSA further analyzed DNA from its Item 2, the specimen from Flynn's mouth, which it had retained and stored frozen in its DNA archive. This time, FSA developed a more complete male DNA profile that occurs in about 1 in 285 million Caucasian males. In 2007, the federal district court in Apanovitch's habeas case ordered Apanovitch, a Caucasian male, to provide a sample of his DNA for comparison. After analyzing that sample, FSA concluded that Apanovitch could not be eliminated as the source of the sperm taken from Flynn's mouth. Apanovitch contests that finding, arguing that FSA's report is unreliable.

## C. Apanovitch's fourth postconviction petition

{¶ 15} In 2012, Apanovitch filed his fourth postconviction petition, focusing on the coroner's office's 2000 test of a specimen taken from Flynn's vagina. At the postconviction hearing, Dr. Rick Staub, Apanovitch's expert, testified about his review of the results of the testing of that specimen. Unlike the coroner's office, Dr. Staub concluded that a sample from the vaginal slide had provided useful results. In his opinion, the testing showed that Apanovitch's sperm was not on that slide, but the DNA of at least two other unknown males was on the slide; Apanovitch, therefore, was excluded as a contributor of the sperm. The state's expert at the postconviction hearing, Dr. Elizabeth Benzinger, testified that the vaginal sample contained a low level of DNA and could have been contaminated, but she did not testify as to whether Apanovitch was excluded as a contributor of the sperm.

{¶ 16} Because Dr. Benzinger did not contradict Dr. Staub's opinion that Apanovitch was excluded as a contributor to the vaginal sample, the trial court acquitted Apanovitch on the vaginal-rape charge.  The trial court also dismissed the other rape charge with prejudice "for its lack of specificity or differentiation from the other count in violation of [Apanovitch's] due process rights." Based on the changes regarding the evidence and to the charges, the trial court granted Apanovitch a new trial on the remaining aggravated-murder and aggravated-burglary counts.

{¶ 17} In reaching its decision, the trial court found that "there was insufficient material to reach any conclusion whether [Apanovitch's] DNA was contained in the materials recovered from the victim's mouth." Because evidence of the 2007 report from FSA was not presented at the postconviction hearing, the trial court did not consider FSA's finding in that report that only 1 in 285 million Caucasians has the same DNA profile as Apanovitch and the sperm found in Flynn's mouth. The trial court noted that the state had stipulated prior to the postconviction hearing that it would not rely on any evidence generated by Dr. Edward Blake, the author of that report, who did not testify at the hearing.

{¶ 18} On the state's appeal, the court of appeals held that the trial court did not abuse its discretion in finding Apanovitch actually innocent of vaginal rape. 2016-Ohio-2831, 64 N.E.3d 429, at ¶ 46. It also affirmed the trial court's dismissal of the second rape charge. *Id.* at ¶ 55, 61. The state did not assert an assignment of error concerning the trial court's decision granting a new trial.

*State v. Apanovitch*, 2018-Ohio-4744, 155 Ohio St. 3d 358, 359-61, 121 N.E.3d 351, 351-56.

The Ohio Supreme Court ultimately determined Apanovitch's fourth petition for post-conviction relief was untimely and successive, explaining Apanovitch failed to satisfy any exception to the post-conviction relief's statute of limitations:

{¶ 24} The trial court found that Apanovitch's postconviction petition satisfies R.C. 2953.23(A)(2). Apanovitch argues that we must defer to that determination absent an abuse of discretion. But "the question whether a court of common pleas possesses subject-matter jurisdiction to entertain an untimely petition for postconviction relief is a question of law, which appellate courts review de novo." *State v. Kane*, 10th Dist. Franklin No. 16AP-781, 2017-Ohio-7838, 2017 WL 4251759, ¶ 9.

{¶ 25} We begin by examining R.C. 2953.23(A)(1). That exception would allow the trial court to consider Apanovitch's untimely and successive petition if (1) Apanovitch was "unavoidably prevented from discovery of the facts" upon which

his claim relies *or* he is asserting a claim based on a new, retroactively applicable federal or state right recognized by the United States Supreme Court after his petition became untimely and after he had filed earlier petitions, R.C. 2953.23(A)(1)(a), *and* (2) he shows by clear and convincing evidence that no reasonable factfinder would have found him guilty or eligible for the death sentence but for "constitutional error at trial," R.C. 2953.23(A)(1)(b).

{¶ 26} We need not address whether Apanovitch satisfies R.C. 2953.23(A)(1)(a), because he clearly has not satisfied R.C. 2953.23(A)(1)(b), which requires him to show that his conviction resulted from "constitutional error at trial." In arguing that he satisfied R.C. 2953.23(A)(1)(b), Apanovitch asserts only that he is actually innocent of a rape charge. The United States Supreme Court has ruled that under the United States Constitution, an actual-innocence claim "is not itself a constitutional claim," *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), and this case, therefore, does not involve a "constitutional error at trial" under R.C. 2953.23(A)(1)(b). *See State v. Willis*, 2016-Ohio-335, 58 N.E.3d 515, ¶ 15-19 (6th Dist.). Additionally, Apanovitch does not raise any argument that there was a "constitutional error at trial" under the Ohio Constitution. Apanovitch's petition, therefore, does not qualify under R.C. 2953.23(A)(1).

{¶ 27} That leaves R.C. 2953.23(A)(2), which allows a trial court to entertain an untimely and successive petition filed by an offender for whom DNA testing was performed under sections 2953.71 to 2953.81 of the Revised Code or under former section 2953.82 of the Revised Code and analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code.

{¶ 28} The trial court construed this language broadly, stating that a postconviction petition "is timely when it *involves the testing of DNA.*" (Emphasis added.) The trial court appears to have assumed that Apanovitch satisfied R.C. 2953.23(A)(2) simply because he was making a claim based on DNA evidence.

{¶ 29} The statutory language of R.C. 2953.23(A)(2), however, is more circumscribed. It confers jurisdiction over a select class of DNA-based actual-innocence claims—only those arising from an eligible offender's application for DNA testing under R.C. 2953.71 to 2953.81 or under former R.C. 2953.82. The state asserts—and Apanovitch does not dispute—that the DNA testing at issue here was not performed as a result of a request by Apanovitch under R.C. 2953.71 to 2953.81 or under former R.C. 2953.82. The parties agree that *the state* asked the Cuyahoga County Coroner to test the vaginal slide and that at *the state's request* the federal district court ordered Apanovitch to provide his DNA for comparison. Thus, Apanovitch's petition does not satisfy the plain language of R.C. 2953.23(A)(2).

{¶ 30} Apanovitch nevertheless argues that his petition qualifies under R.C. 2953.23(A)(2), first by claiming that he requested DNA testing in 1989. This argument does not help Apanovitch. Even if he sought DNA testing in 1989, he clearly did not do so under R.C. 2953.71 to 2953.81 or under former R.C. 2953.82, because those statutes were not enacted until 2003. Sub.S.B. No. 11, 150 Ohio Laws, Part IV, 6498, 6507-6524, 6525.

{¶ 31} He also argues that notwithstanding R.C. 2953.23(A)(2)'s clear reference to DNA testing performed under R.C. 2953.71 to 2953.81 or under former R.C. 2953.82, the circumstances under which the DNA was tested are "immaterial." This argument relies principally on R.C. 2953.84, which provides:

> The provisions of sections 2953.71 to 2953.81 of the Revised Code by which an offender may obtain postconviction DNA testing are not the exclusive means by which an offender may obtain postconviction DNA testing, and the provisions of those sections do not limit or affect any other means by which an offender may obtain postconviction DNA testing.

{¶ 32} According to Apanovitch, "DNA testing under R.C. 2953.71 to 2953.81 is not the exclusive means for supporting a petition for postconviction relief," because "requiring petitions to be based solely on DNA testing under those sections would render R.C. 2953.84 superfluous in violation of basic tenets of legislative interpretation." But Apanovitch disregards the clear language of R.C. 2953.84, which speaks only of the "means by which an offender may *obtain postconviction DNA testing*." (Emphasis added.) That statute does not address the means for supporting an untimely and successive postconviction petition based on DNA testing. Only R.C. 2953.23(A)(2) does that. If Apanovitch is correct that R.C. 2953.84 opens the door for untimely and successive postconviction petitions based on *any* DNA testing, then R.C. 2953.23(A)'s reference to DNA testing "performed under sections 2953.71 to 2953.81 of the Revised Code or under former section 2953.82 of the Revised Code" would have no meaning.

{¶ 33} Apanovitch also contends that R.C. 2953.23(A)(2) cannot be strictly limited to DNA testing performed under R.C. 2953.71 to 2953.81 or former R.C. 2953.82, because that would lead to harsh and absurd results. This argument presumes that the procedures established by the General Assembly in R.C. 2953.71 to 2953.81 and former R.C. 2953.82 serve no legitimate purpose—something Apanovitch has not shown. At most, he makes an equitable argument based on what has transpired over the last 30 years. But even assuming arguendo that the equities are in his favor, as Apanovitch maintains, his argument cannot overcome the clear requirements established by the General Assembly that give a trial court jurisdiction to entertain petitions for postconviction relief only in certain, limited situations.

{¶ 34} Finally, Apanovitch contends that strictly applying R.C. 2953.23(A)(2) would encourage the state to prevent offenders from initiating DNA testing under R.C. 2953.71 to 2953.81. This argument rings hollow because, despite his claims, Apanovitch has not shown that he ever tried to pursue—or that the state prevented him from seeking—DNA testing under the statutory scheme. Indeed, Apanovitch now asserts that he can pursue testing under R.C. 2953.71 to 2953.81, further undermining his argument.

*State v. Apanovitch*, 2018-Ohio-4744, 155 Ohio St. 3d 358, 363–66, 121 N.E.3d 351, 357–59.

7

Because the Ohio Supreme Court found Apanovitch's petition was untimely and successive, it held the trial court lacked jurisdiction to hear the petition:

> **{¶ 41}** We recognize that it may seem unduly formalistic or unfair to foreclose the trial court from considering a postconviction claim that is based on DNA testing that the state itself procured. But it is the prerogative of the General Assembly, not this court, to set the terms by which an offender may pursue postconviction relief. *See Calhoun*, 86 Ohio St.3d. at 281, 714 N.E.2d 905 (postconviction rights are granted by statute); *State v. Smorgala*, 50 Ohio St.3d 222, 223, 553 N.E.2d 672 (1990) (the legislature's valid laws control policy preferences). The legislature in R.C. 2953.23(A) has created a narrow path for an offender to bring an untimely and/or successive postconviction claim based on DNA evidence. Because Apanovitch did not satisfy either of the exceptions provided in R.C. 2953.23(A), the trial court fundamentally lacked jurisdiction to consider his petition or to provide relief under R.C. 2953.21.

*State v. Apanovitch*, 2018-Ohio-4744, 155 Ohio St. 3d 358, 368, 121 N.E.3d 351, 361. The court vacated the trial court's judgment acquitting Apanovitch of vaginal rape, dismissing the other rape count, and granting him a new trial; it likewise vacated the court of appeals' decision affirming the trial court. *Id.* The supreme court remanded the case to the trial court to determine if any further proceedings were necessary.

On remand, the trial court determined the only remaining consideration was Apanovitch's Rule 33 Motion for New Trial, which the parties originally stipulated the trial court would consider along with his fourth post-conviction relief petition, and which the Ohio Supreme Court "left open on remand." (Doc. 17-4, 1412). This time, the trial court found that the 2007 FSA report linking Apanovitch to the DNA found in Flynn's mouth was proper for consideration under the law of the case doctrine. (Doc. 17-4, 1413-15). The trial court noted this Court "accepted" the report during Apanovitch's first habeas proceeding, and in the appeal of that proceeding, there was "no mention of any challenge to the manner in which" the report was considered; the court also noted the Ohio Supreme Court considered the report in its opinion. *Id.* The trial court denied Apanovitch's motion

for new trial on the ground that he was unable to demonstrate a strong possibility that a new trial

would have a different outcome.[3]  (Doc. 17-4, 1416).  It explained:

> The inclusion of the DNA evidence in considering a motion for new trial makes it less likely that a new trial will change the result. With the inculpatory evidence and the circumstantial evidence [presented at trial], Defendant is unable to show a strong possibility that the new DNA evidence will change the result if a new trial is granted. The record in this case is troubling. The Ohio Supreme Court, in the original appeal, issued a 4-3 per curiam decision with the dissenters approving the underlying convictions but it was stated, in the dissent:
>
>> A conviction may be affirmed upon circumstantial evidence and even upon a record with as many holes as this one. But in this case, I am not persuaded that the death sentence is appropriate, even though the crime would merit the penalty if there were no doubt as to the defendant's guilt. *State v. Apanovitch* 33 Ohio St. 3rd 19.
>
> Realizing that this is repetitive, the mere fact that such a major trial could be indicted and be before a jury only 55 days following the indictment, raises concern over the ability of the Defendant to fully and properly prepare and present a defense. That issue has apparently long since passed but remains a concern. It is difficult to be at the end of the line, but the case law and the 11 cases involving the Defendant leave this court with no option other than to deny the motion for new trial on the basis that the Defendant is unable to show a strong possibility that a new trial would end in a different result.

(Doc. 17-4, 1416).  Based on the testimony that Apanovitch was not a contributor to the DNA

sample taken from the victim's vagina, the trial court acquitted Apanovitch of the vaginal rape, but

left the remaining rape count and other convictions and Petitioner's sentence intact, consistent with

the Ohio Supreme Court's opinion.  *Id.*  The Eighth District Court of Appeals affirmed the trial

---

[3] To succeed on a motion for new trial based on newly-discovered evidence, a defendant must show that the new evidence:

> (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Hawkins*, 66 Ohio St. 3d 339, 350, 612 N.E.2d 1227, 1235 (1993) (quoting *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370).

court on the ground that Apanovitch failed to file a motion for leave to file his motion for new trial out of time.  (Doc. 17-4, 1490-95).  The Ohio Supreme Court declined to exercise jurisdiction over Apanovitch's appeal from the court of appeals' decision.  (Doc. 17-4, 1543).

## AEDPA REVIEW

Habeas corpus is essentially "an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).  Apanovitch's petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's effective date).  The Act, which amended 28 U.S.C. § 2254, authorizes federal courts to issue writs of habeas corpus to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

At the same time, however, AEDPA was intended "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Id*. at 19.

Most significantly, § 2254(d) forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

10

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). A state court has adjudicated a federal claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (applying presumption to state-court summary dispositions).

"[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case. *Wright v. Van Patten*, 552 U.S. 120, 125 (2008). A state-court decision is "contrary to" clearly established federal law under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a

set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[4]

The Supreme Court has repeatedly emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute

---

[4] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

for ordinary error correction through appeal." *Richter,* 562 U.S. at 102-03 (internal quotation marks and citation omitted). This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

**Exhaustion and Procedural Default**

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

13

Procedural default is an "important corollary" to the exhaustion requirement. *Davila v. Davis,* 582 U.S. 521, 527 (2017) (internal quotation marks and citation omitted). The doctrine generally prevents federal courts from hearing federal constitutional claims that were not presented to the state courts "consistent with [the state's] own procedural rules." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). It occurs when a habeas petitioner failed to either: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28.

Where a state court declines a prisoner's federal claim because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, habeas courts again employ a "look through" presumption and review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst,* 501 U.S. at 805. If the last state court "explicitly imposes a procedural default," then the claim is presumed defaulted. *Id.* at 803. Conversely, if the last state court presented with the claim reaches its merits in a decision that "'fairly appear[s] to rest primarily upon federal law,'" then any procedural bar is presumed removed, and the federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 803 (citation omitted).

14

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered.  *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*.  To establish prejudice, a petitioner must demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## Cognizability

Federal habeas courts also must consider whether the petitioner's claims are cognizable. To the extent a claim alleges state-law violations, it is not reviewable by a federal habeas court and must be dismissed on that basis.  "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").  Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

15

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id.* (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

**PETITIONER'S GROUNDS FOR RELIEF**

Apanovitch asserts six grounds for relief in his petition, stated as:

I. First Claim for Relief:
Because Apanovitch is actually innocent, his convictions and death sentence are unconstitutional under the Eight and Fourteenth Amendments to the United States Constitution

II. Second Claim for Relief:
Apanovitch's conviction and death sentence are unconstitutional because the State suppressed material exculpatory DNA evidence, which shows that Apanovitch was not the perpetrator of the crime for which he was convicted in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

III. Third Claim for Relief:
The Ohio courts' consideration of the unadmitted 2007 FSA report violated Apanovitch's rights under the Confrontation Clause under the Sixth and Fourteenth Amendments to the United States Constitution

IV. Fourth Claim for Relief:
[The trial court's] 2019 failure to dismiss the carbon-copy rape count violated the Double Jeopardy Clause under the Fifth and Fourteenth Amendments to the United States Constitution

V. Fifth Claim for Relief:
The Ohio courts applied the state postconviction scheme arbitrarily and rendered it inadequate to vindicate Apanovitch's due process rights under the Fourteenth Amendment to the United States Constitution
      A. The Ohio Supreme Court Arbitrarily Applied Its Collateral Review Scheme and Violated Apanovitch's Due Process Rights

16

B. The Ohio courts' Consideration of The Unadmitted 2007 FSA
Report Violated Apanovitch's Due Process Rights
C. [The trial court's] Arbitrary Application of The Law-Of-The-
Case Doctrine Violated Apanovitch's Due Process Rights.
D. The Eighth District's Application of Crim.R. 33's Procedural
"Requirements" Violated Apanovitch's Due Process Rights

VI. Sixth Claim for Relief:
Apanovitch is entitled to have his claims reviewed de novo on the merits
because Ohio's State Post-Conviction Statute as applied to bar
relief in his case is neither firmly established nor regularly followed

(Doc. 1-2, 18-19).

## Claim I: Actual Innocence

Apanovitch argues his convictions and death sentence are unconstitutional under the Eighth

and Fourteenth Amendments because he is actually innocent.  He asserts that the Sixth Circuit and

Supreme Court have recognized a freestanding claim of actual innocence where a petitioner in a

capital case makes a "truly persuasive demonstration of actual innocence," citing, *inter alia*,

*Herrera v. Collins*, 506 U.S. 390 (1993), and *McQuiggin v. Perkins*, 569 U.S. 383 (2013).  (Doc.

1-2, 39-40).   According to Apanovitch, he has made a persuasive demonstration of actual

innocence, such that his execution would be constitutionally impermissible.  (Doc. 1-2, 41).  He

maintains that the only DNA evidence *of record* establishes that he did not rape the victim and

because the State's theory has always been that the victim was raped and killed by a single

perpetrator, it follows that he also did not murder the victim.  (Doc. 1-2, 41).  In arguing the Court

should recognize a claim of actual innocence, existing apart from an independent underlying

constitutional violation, Apanovitch broadly claims that to allow the State of Ohio to execute him

in the face of the existence of exculpatory DNA results would violate clearly established federal

law and be an unreasonable determination of the facts.  (Doc. 21, 50-51).  He relies primarily on

the Eighth Amendment prohibition against cruel and unusual punishment, asserting that an

execution which serves no legitimate penological purpose violates the prohibition, and more

17

generally violates respect for human dignity, which is "the cornerstone" of the Eighth Amendment. (Doc. 21, 56-60). Apanovitch acknowledges that under AEDPA, a reviewing habeas court gives great deference to State's courts' factual findings, but argues AEDPA does not *prohibit* a habeas court from reviewing State court findings of facts; it only places a high burden on the petitioner to overcome the presumption of correctness of the State court's factual findings by "clear and convincing" evidence. (Doc. 21, 61-62).

Respondent argues Apanovitch's first claim regarding actual innocence fails to state a cognizable ground for relief, explaining the Sixth Circuit and U.S. Supreme Court have repeatedly declined to recognize a freestanding claim of actual innocence on habeas review. (Doc. 20, 17). Respondent asserts that, nevertheless, Apanovitch's actual innocence claim is meritless. According to Respondent, Apanovitch's insistence that he could not have committed the murder of Flynn because he did not commit the rape—based on newly-discovered exculpatory DNA evidence—is erroneous because other DNA evidence showed Apanovitch's DNA was present in Flynn's mouth. Respondent argues the DNA evidence relied upon by Apanovitch, at most, raises some doubt about whether he vaginally raped Flynn, a charge for which he is no longer convicted, but does nothing to prove Apanovitch is innocent of her murder or oral rape. (Doc. 20, 19). In making this argument, Respondent also notes (1) sperm can survive for longer periods of time in the vagina than in the mouth, indicating the inculpatory oral sample was more temporally connected to the murder, (2) there was less sperm in the vaginal sample than in the oral sample, thus making the oral sample theoretically more reliable or less vulnerable to contamination, and (3) the retested vaginal slides "exculpating" Apanivitch were of low quality. (Doc. 20, 19). Respondent contends Apanovitch is mistaken in asserting FSA Item 2—containing his DNA—was considered inconclusive, noting Dr. Ford was never asked to review it and Dr. Staub did not testify

18

Item 2 was inconclusive; the oral slides that Dr. Staub testified about at the PCR hearing involved the "pathology slides" that had already been determined to be insufficient for testing by FSA.

**Analysis**

First, the cases relied upon by Apanovitch do not stand for the proposition that a petitioner may seek habeas relief based on a freestanding claim of actual innocence; to the contrary, they make clear that the Supreme Court has declined to make such a holding, instead holding that a proper showing of actual innocence may overcome the defenses of procedural default or abuse of the writ.  *See McQuiggin v. Perkins*, 569 U.S. 383, 392, 133 S. Ct. 1924, 1931 (2013) "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief."); *Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 860 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *see also House v. Bell*, 547 U.S. 518, 522, 126 S. Ct. 2064, 2068 (2006) (declining to resolve the issue of the viability of a free standing actual innocence claim, but holding: "In certain exceptional cases involving a compelling claim of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition."). Neither are at issue with regard to this particular claim.  Accordingly, this Court finds Apanovitch's claim of actual innocence is not cognizable on habeas review.  *See Schlup v. Delo*, 513 U.S. 298, 315, 115 S. Ct. 851, 861 (1995) (holding the petitioner's claim of actual innocence was not a constitutional claim, but a "gateway through which [a habeas petitioner] must pass to have his otherwise barred constitutional claim considered on the merits."); *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) ("In the wake of *Schlup,* we have repeatedly indicated that such claims are not cognizable on

habeas."). We also note that although Apanovitch learned of the 2000 testing of the vaginal and oral slides in December 2008, he failed to raise the issue during this Court's chain-of-custody hearing in February 2009 or in his post-hearing brief; he did not raise the issue until his August 2009 motion for reconsideration from the denial of his habeas petition.

Even assuming Apanovitch's claim were properly before this Court and cognizable, it is without merit. Apanovitch consistently characterizes the 2000 testing as exculpatory, and calls into question the reliability of the FSA 2007 testing. However, its important to distinguish between the slides tested by FSA—FSA Item 2, in particular—from the slides created by the Coroner's Office in 2000. The trace evidence slides created during Flynn's autopsy and thought to be lost or destroyed were found and submitted to FSA for testing in 1991; FSA determined one oral swab (FSA Item 2) could be tested but the other oral slide (FSA Item 3A) and the vaginal slide (FSA Item 3B) were insufficient for testing. In June 1992, the State submitted a supplemental return to Apanovitch's then-pending first habeas petition, informing this Court of the trace evidence slides and requesting a DNA sample from Apanovitch for comparison (with FSA Item 2), which he refused to provide. The later 2007 FSA report finding Apanovitch's DNA matched the DNA found in Flynn's mouth was based on testing of this item, FSA Item 2.

In 2000, the Coroner's Office attempted to test two of the three trace evidence slides returned from FSA—the second oral slide (FSA Item 3A) and the vaginal slide FSA (Item 3B); they did not attempt to retest FSA Item 2. At that juncture, the smear from FSA Item 3A became Coroner's Item 2.1 and the smear from FSA Item 3B became Coroner's Item 1.1 and Item 1.2. The Coroner's Office determined there was too little material left for further testing; therefore, they requested access to another set of slides that had been stored in the pathology department since Flynn's autopsy. From these pathology slides, the Coroner's Office created, among others,

20

two oral smears, labelled Coroner's Item 5 and Coroner's Item 6.1, and a vaginal smear, labelled Coroner's Item 3.1.

In 2009, Apanovitch retained Dr. Ford, who reported that the non-sperm portion of Coroner's Item 2.1—the second oral slide which the Coroner's Office and FSA had both previously determined was insufficient for testing—was a mixture of two females, neither of which was the victim, and that Apanovitch was excluded from Item 1.2, which the Coroner's Office had also deemed insufficient for testing.  Likewise, Apanovitch's expert at the post-conviction relief hearing before the trial court, Dr. Staub, testified that Coroner's Item 1.2 contained two male DNA profiles, neither of which was Apanovitch.  Notably, neither Dr. Ford nor Dr. Staub offered an opinion as to FSA Item 2.  Based on the foregoing, Apanovitch's attempts to undermine the validity of the 2007 FSA report finding his DNA was a match to FSA Item 2 are misguided.  It is also notable that the "exculpatory" DNA evidence, upon which Apanovitch's post-conviction newly-discovered evidence claim was based, was derived from samples that FSA and the Coroner's Office determined were deteriorated and inappropriate for testing.  Additionally, the 2007 FSA report, which is undoubtedly at this point a part of the record before this Court, as discussed in more detail below, undermines the inculpatory value of the results of the 2000 testing as testified to by Apanovitch's expert before the trial court.

Because Apanovitch has failed to state a cognizable constitutional claim and failed to demonstrate the Ohio Supreme Court's holding reversing the trial court's decision vacating his convictions was objectively unreasonable, we deny this claim. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *see also Price v. Vincent*, 538 U.S. 634, 641 (2003) (explaining

21

the petitioner has the burden to demonstrate the state court's decision was objectively unreasonable).

### Claim II: *Brady* Claim

Apanovitch argues his conviction and death sentence violate his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the State suppressed material exculpatory evidence showing he was not the perpetrator. (Doc. 1-2, 41). According to Apanovitch, the State is under an ongoing obligation to provide exculpatory evidence to the defendant, and the State failed to meet that duty when it neglected to inform Apanovitch that the DNA testing it conducted in 2000 indicated he was excluded as a contributor to the DNA found in the victim's vagina. (Doc. 1-2, 41-42). Even assuming the duty to disclose exculpatory evidence does not extend past trial, Apanovitch maintains that under the circumstances present in this case—where the State attempted to put forth DNA evidence developed after trial to *inculpate* the defendant—the State violated his rights by simultaneously withholding exculpatory DNA evidence acquired through the State's own post-trial testing. (Doc. 1-2, 42).

Apanovitch further argues that the evidence the State failed to disclose is "material," because had the exculpatory DNA results been disclosed to the defense, there is a reasonable probability of a different outcome. (Doc. 21, 65). According to Apanovitch, a reasonable probability of a different outcome for *Brady* purposes does not necessarily mean a different verdict, but rather the impact the evidence would have had on the fairness of trial, the defense strategies available, and the confidence in the investigation and the verdict. (Doc. 21, 65-66). Apanovitch argues that to hold the exculpatory results are not material would grant the State a windfall for their manipulation and misrepresentations during the post-conviction processes. (Doc. 21, 70-75). As to procedural default, Apanovitch claims that the State's withholding of exculpatory evidence

22

constitutes a *per se* excuse to overcome procedural default in federal habeas cases. (Doc. 21, 84).

He further argues the Ohio Supreme Court's vacation of the trial court's ruling on jurisdictional grounds and failure to acknowledge the constitutional *Brady* claim presented in his fourth petition for post-conviction relief was erroneous, and the post-conviction statute, as applied to this case, was neither "firmly established" nor "regularly followed." (Doc. 21, 84-85).

Respondent argues Apanovitch's *Brady* claim does not warrant habeas relief because it is barred by the non-retroactivity rule, which prevents a federal court from granting habeas relief to a state prisoner based on a rule adopted after his conviction and sentence became final. (Doc. 20, 20). According to Respondent, by arguing that the State's *Brady* obligations to disclose extend beyond trial, Apanovitch is advocating for a new rule of procedure upon which habeas relief cannot be granted. (Doc. 20, 20). Additionally, Respondent argues Apanovitch's *Brady* claim is procedurally defaulted because he did not raise this particular claim in the appeal following the denial of his motion for a new trial, nor in his unsuccessful attempt to appeal before the Ohio Supreme Court. (Doc. 20, 21). Respondent maintains Apanovitch's *Brady* is without merit in any event because even if the State were required to disclose the evidence at issue, Apanovitch was not thereby deprived of a fair trial. (Doc. 20, 21). Respondent asserts that attacks on the fairness of post-conviction proceedings are not cognizable on habeas corpus review. (Doc. 20, 21).

**Analysis**

Like Claim I, this Court finds Apanovitch has failed to assert a cognizable claim for habeas relief as to his *Brady* issue. Apanovitch failed to point to any U.S. Supreme Court precedent holding that the State's *Brady* duties extend to post-conviction proceedings; to the contrary, the Supreme Court has stated "nothing in our precedents suggested that [the State's] disclosure obligation continued after the defendant was convicted and the case was closed." *Dist. Attorney's*

23

*Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68, 129 S. Ct. 2308, 2319-20 (2009).  In that case, the Supreme Court overturned the Ninth Circuit Court of Appeals' holding that Due Process required the State's *Brady* obligations be extended to the post-conviction context, noting, "A criminal defendant proved guilty after a trial does not have the same liberty interests as a free man."  *Id.*; *see also United States v. Smith*, 749 F.3d 465, 492 (6th Cir. 2014) ("*Brady* requires that the prosecution disclose all exculpatory and impeachment evidence that is in the government's possession in time for use at trial.  This obligation entails a duty to learn of any favorable evidence known to others acting *on the government's behalf* in the case.  But *Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess.") (internal quotation marks and citations omitted).  In *Smith*, the Sixth Circuit held the prosecutor did not violate *Brady* with respect to a report that was written more than a year after trial, reasoning, "A report prepared more than one year after trial was obviously not available for a timely disclosure by the prosecution."  *Smith*, 749 F.3d at 492.  The evidence at issue here was not developed until long after Apanovitch's convictions and sentence became final on direct appeal in 1987.

Moreover, even assuming Apanovitch's *Brady* claim were proper for habeas review, this Court finds that in light of the circumstantial evidence originally presented at trial, in conjunction with the inculpatory 2007 FSA report, Apanovitch's newly discovered evidence was not "material."  *See Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948, (1999) ("Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *see also Cone v. Bell*, 556 U.S. 449, 470, 129 S. Ct. 1769, 1783 (2009) ("In other words, favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in

such a different light as to undermine confidence in the verdict.") (internal quotation marks omitted).  Accordingly, this claim is denied.

**Claim III: Confrontation Clause**

Apanovitch argues the Ohio State courts' consideration of the 2007 FSA report violated his Confrontation Clause rights.  (Doc. 1-2, 43).  According to Apanovitch, he was denied the right to have the evidence against him subjected to rigorous testing in an adversarial proceeding, in violation of the Sixth and Fourteenth Amendments because the 2007 FSA report was "unadmitted, untested, and unchallenged."  (Doc. 1-2, 44).  He maintains that in his first habeas petition before this Court, he was denied the opportunity to challenge the report, despite rigorous requests to do so, and he relied, to his detriment, on the parties' stipulation that the 2007 report would not be used for any purpose, given that its author was unable to be procured for testimony.  (Doc. 1-2, 44; Doc. 21, 104).   Apanovitch contends this Court conflated the chain of custody issue with the authentication/reliability issue concerning the report, which Apanovitch was never afforded an opportunity to address, and the trial court, in relying on the 2007 report, ignored the Sixth Circuit's 2011 opinion in which it stated the 2007 report was not relevant and this Court should not have considered it in analyzing prejudice regarding his *Brady* claims.  (Doc. 21, 104).  Apanovitch argues the Ohio Supreme Court, in its 2018 opinion reversing the trial court and court of appeals' grant of post-conviction relief, erroneously applied law-of-the-case doctrine to consider the 2007 report, when Apanovitch was never given an opportunity to challenge the authenticity or methodology used to obtain the results therein.  (Doc. 1-2, 44).

Respondent argues Apanovitch's Confrontation Clause claim, like his *Brady* claim, is barred by the non-retroactivity rule.  (Doc. 20, 22).  According to Respondent, a petitioner's rights under the Confrontation Clause are trial rights; therefore, Apanovitch's attempt to invoke those

rights in this context amounts to seeking relief under a new procedural rule.  (Doc. 20, 22).

Additionally, Respondent maintains this claim fails on the merits because attacks on the fairness

of state post-conviction proceedings are not cognizable in the federal habeas context.  (Doc. 20,

22).  Respondent further argues Apanovitch was the first party to introduce the 2007 FSA testing

that inculpated him, the 2007 FSA testing was already addressed in the prior decisions of this Court

and the Sixth Circuit, and Apanovitch declined to challenge the introduction of the 2007 results

during the proceedings on remand regarding his Rule 33 motion for new trial.  (Doc. 20, 23).

**Analysis**

Like Apanovitch's first two claims, this Court finds his claim regarding the admission of

the 2007 FSA report is not cognizable on habeas review.  Apanovitch has failed to demonstrate

the state courts' decisions contravened clearly established law, as he cites to no Supreme Court

precedent recognizing a defendant's Confrontation Clause rights in the context of post-conviction

proceedings.  *See Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (holding a state-court decision

is "contrary to" clearly established federal law under § 2254(d)(1) only "if the state court arrives

at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts.").

Apanovitch's arguments concerning the propriety of the state courts' consideration of the

2007 FSA report likewise do not present an avenue for habeas relief; the 2007 report is

undoubtedly proper for consideration by this Court, as it is part of the state court record, and any

alleged evidentiary errors that occurred in the state proceedings are beyond the purview of this

Court on habeas review.  *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under §

2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the

26

merits."); *see also Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) ("alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review."); *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) (a federal court on habeas review does not "pass upon 'errors in the application of state law, especially rulings regarding the admission or exclusion of evidence.'" (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)). *Wright v. Lazaroff*, 643 F. Supp. 2d 971, 991 (S.D. Ohio 2009) ("Petitioner's claims that his post-conviction relief proceedings were rendered unfair by the omission of exhibits and that the state appellate corrective process is inadequate or ineffective to protect petitioner's rights challenge the correctness of the state post-conviction process and not the conviction itself[. ] Allegations of error in this process are not cognizable on federal habeas corpus review."). We do not believe under the circumstances of this case, Apanovitch has demonstrated that any issue with the state courts' consideration of the 2007 report rose to the level of a denial of fundamental justice. *See Coleman*, 244 F.3d at 542 (explaining a state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (such errors must be "so egregious that [they] result[]in a denial of fundamental fairness"). Based on the foregoing, this claim is denied.

### Claim IV: Double Jeopardy

Apanovitch argues the trial court's failure to dismiss the "carbon copy" rape count, after the Ohio supreme court's 2018 reversal and remand, violated his Double Jeopardy Clause rights under the Fifth and Fourteenth Amendments. (Doc. 1-2, 45). Apanovitch asserts that the trial court was correct when, in 2015, it acquitted him of one count of rape based on the newly discovered DNA evidence and dismissed the second rape count, pursuant to *Valentine v. Konteh*, 395. F3d. 626 (6th Cir. 2005), on the basis that there was nothing differentiating the conduct

27

underlying the two counts, thereby making it impossible for the defendant to adequately prepare a defense. (Doc. 1-2, 45-46, Doc. 21, 115-18). Apanovitch contends that although the trial court correctly acquitted him of the vaginal rape on remand, the trial court erred when it failed to dismiss the identically-worded second rape count without explanation for the court's changing position. (Doc. 1-2, 46, Doc. 21, 117).

Respondent argues that, like his *Brady* and Confrontation Clause claims above, Apanovitch's Double Jeopardy claim is barred by the non-retroactivity rule because none of the protections of the Double Jeopardy Clause apply to Apanovitch's situation—he was not prosecuted twice, nor punished twice for the same offense. (Doc. 20, 24). Additionally, Respondent maintains Apanovitch is seeking to extend the protections of the Double Jeopardy Clause to motions for new trial and post-conviction proceedings, thereby creating a new procedural rule. (Doc. 20, 24). As to the merits of Apanovitch's claim, Respondent contends his reliance on *Valentine* is misguided, as federal habeas relief cannot hinge on a holding of the Sixth Circuit alone, and the *Valentine* Court does not cite any holding of the U.S. Supreme Court extending the protections of the Double Jeopardy Clause to these circumstances. (Doc. 20, 25). Moreover, Respondent argues *Valentine* is distinguishable because here, the jury was instructed that a rape charge can be supported by *either* oral or vaginal penetration, whereas in *Valentine*, the Sixth Circuit determined there was *no* evidence to support five of the twenty charges. (Doc. 20, 25).

Apanovitch's Double Jeopardy claim is without merit. First, Apanovitch fails to articulate how the state courts' decisions violated clearly established law, as he cites no Supreme Court precedent holding that a defendant's Double Jeopardy rights are implicated when the State charges him with two counts of the same charge with separate underlying factual bases; *Valentine* does not meet the criteria of "clearly established law," as it is a Sixth Circuit case. *See White v. Woodall*,

28

572 U.S. 415, 419 (2014) (clearly established law includes only the holdings of U.S. Supreme Court decisions) (internal quotation marks and citations omitted); *Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case).

Furthermore, *Valentine* is distinguishable.  The defendant in *Valentine* was charged with forty identically-worded criminal counts relating to multiple child victims and numerous separate incidents of abuse over a large span of time; the Sixth Circuit found the counts "were not anchored to forty distinguishable criminal offenses," thus depriving the defendant of the ability to adequately defend himself against the charges.  *Valentine*, 395 F.3d at 633.  The circuit court explained:

> Given the way Valentine was indicted and tried, it would have been incredibly difficult for the jury to consider each count on its own. The jury could not have found Valentine guilty of Counts 1–5, but not Counts 6–20. Nor could the jury have found him guilty of Counts 1, 3, 5 and 7, but not the rest. Such a result would be unintelligible, because the criminal counts were not connected to distinguishable incidents.

*Id.* at 633.  Here, unlike in *Valentine*, though the indictment may have been lacking detail, the evidence and theory of the crime as presented by the State at trial certainly apprised the defendant "of what occurrences formed the bases of the criminal charges he faced."  *Id.* at 634.  Whereas "Valentine was prosecuted and convicted for a generic pattern of abuse rather than for forty separate abusive incidents," Apanovitch was prosecuted and convicted for a single incident that involved an oral rape and a vaginal rape, with each crime supporting a separate count of rape.  *Id.*

Based on the foregoing, this claim is denied.

**Claim V: Arbitrary Application of Post-Conviction Statutory Scheme**

29

Apanovitch argues the Ohio state courts applied the post-conviction statutory scheme arbitrarily, rendering it inadequate to vindicate the substantive rights provided therein and violating his due process rights under the Fourteenth Amendment.  (Doc. 1-2, 46-47; Doc. 21, 120-22). Apanovitch contends he has a fundamental liberty interest in not being executed if he can demonstrate his actual innocence.  (Doc. 21, 129).  He asserts that the Ohio Supreme Court's interpretation of R.C. 2953.21, in particular, unconstitutionally deprived him of his freedom, in light of the State's "secret" DNA testing and withholding of the exonerating results.  (Doc. 1-2, 48).  Apanovitch maintains the Court's application was contrary to legislative intent, as indicated by R.C. 2953.84, which provides the provisions of sections 2953.71 through 2953.81 "are not the exclusive means by which an offender may obtain postconviction DNA testing, and the provisions of those sections do not limit or affect any other means by which an offender may obtain postconviction DNA testing."  (Doc. 1-2, 49).

Apanovitch next argues the Ohio courts' consideration of the 2007 FSA report violated his due process rights because the untested report was not before the trial court and court of appeals or part of the evidentiary record and should not have been relied upon for any purpose;  Apanovitch notes both the trial court and court of appeals contradicted their own prior findings in accepting the 2007 report as part of the record.  (Doc. 1-2, 54-55).  Apanovitch further argues the trial court's application of the law of the case doctrine on remand was arbitrary and thus violated his due process rights.  (Doc. 1-2, 57).  According to Apanovitch, the law of the case doctrine does not apply when the two decisions involve different legal issues or evidentiary records, when two difference court systems—i.e. state and federal—are involved, or where application of the doctrine would work a manifest injustice; therefore the trial court's finding that the law of the case

"compelled" it to accept the 2007 FSA report was erroneous, especially where application of the doctrine is discretionary.  (Doc. 1-2, 57-61).

Finally, Apanovitch argues the court of appeals' application of Rule 33's procedural requirements in affirming the trial court's denial of his motion for new trial "was an erroneous and arbitrary application" of state law which violated his due process rights.  (Doc. 1-2, 62).  Apanovitch notes Rule 33 does not require a motion for leave in all cases and failure to file for leave is not a jurisdictional bar to consideration of an untimely motion. (Doc. 1-2, 62).  Apanovitch insists that even if the parties' stipulation was insufficient to satisfy the need for a motion for leave, his motion for new trial included proof that he was "unavoidably preventing" from discovering the new evidence sooner, and to require two separate motions is overly formalistic.  (Doc. 1-2, 63-66).  Additionally, Apanovitch maintains the issue of the procedural propriety of Apanovitch's motion for new trial was not properly before the court of appeals: the trial court found the motion was properly before it and the State did not file a cross-appeal from that finding.  (Doc. 1-2, 66-67).  He argues the court of appeals' elevation of procedure over substance in this fashion flouts "the Constitution's commitment to fundamental fairness." (Doc. 1-2, 66-67).

Respondent argues Apanovitch's claims regarding the state courts' application of the post-conviction relief statute do not warrant federal habeas relief because he fails to present any cognizable grounds for relief. (Doc. 20, 26).  Respondent reiterates his position that alleged errors in post-conviction proceedings are outside the scope of federal habeas review.

**Analysis**

First, this Court finds Apanovitch has failed to state a cognizable habeas claim insofar as he takes issue with the state courts' application of the state post-conviction statute and Rule 33.

31

*See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); *see also Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) ("[T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review."); *Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002) ("[E]rror committed during state post-conviction proceedings can not provide a basis for federal habeas relief."). The Sixth Circuit explained in *Cress* that habeas corpus is an attack on the legality of a defendant's confinement, whereas a due process claim related to a defendant's post-conviction proceedings, even if successful, would not directly result in release from confinement: "though the *ultimate* goal in a case alleging post-conviction error is release from confinement, the result of habeas review of the specific issue[ ] ... is not in any way related to the confinement." *Id.* (internal quotation marks omitted); *see also Pennsylvania v. Finley*, 481 U.S. 551, 556–57, 107 S. Ct. 1990, 1994 (1987) ("Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction. States have no obligation to provide this avenue of relief . . . ."); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (affirming district court's finding that habeas corpus is not the proper avenue for challenging errors in state post-conviction proceedings or to launch challenges to a state's post-conviction statutory scheme).

Moreover, even if the Ohio Supreme Court interpreted R.C. 2953.23(A) narrowly, its interpretation was consistent with the statute as written; nothing about the court's holding with

32

respect to R.C. 2953.23(A) was contrary to the law or involved a factual error. It is undisputed Apanovitch did not seek out the DNA testing at issue; in fact, throughout most of the decades of appeals following his convictions and sentence, he resisted submitting a DNA sample for comparison. *See* Ohio Rev. Code Ann. § 2953.23(A)(2) (allowing an untimely, successive petition for post-conviction relief where DNA testing was performed pursuant to a request by the petitioner pursuant to sections 2953.71 to 2953.81). Additionally, in light of our discussion under Claim I, the Ohio Supreme Court's finding that Apanovitch's petition did not meet the exception under R.C. 2953.23(A)(1) because his actual innocence claim did not constitute a freestanding constitutional claim was likewise not unreasonable. *See* Ohio Rev. Code Ann. § 2953.23(A)(1) (allowing an untimely, successive petition for post-conviction relief where the petitioner shows he "was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief" and "but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted"). Similarly, even assuming Apanovitch's argument regarding the court of appeals' application of Rule 33 were proper for this Court's consideration, the court's finding was consistent with the law and facts and therefore not unreasonable.

As to Apanovitch's arguments concerning the state courts' allegedly erroneous consideration of the 2007 FSA report, we refer to our discussion under Claim III and decline to rehash this issue.

Based on the foregoing, we deny this claim.

## Claim VI: De Novo Review

33

In his sixth claim for relief, Apanovitch argues he is entitled to have all of his claims reviewed *de novo* on the merits because Ohio's post-conviction relief statute as applied in this case "is neither firmly established nor regularly followed." (Doc. 1-2, 69).  Apanovitch acknowledges that an adequate state ground bars federal habeas review of a constitutional claim, but maintains that the procedural grounds upon which the Ohio state courts staked their holdings "force[] resort to an arid ritual of meaningless form," as they serve "no perceivable state interest." (Doc. 1-2, 69) (citing *James v. Kentucky*, 466 U.S. 341, 349 (1984)).  Neither the State's return nor Apanovitch's traverse explicitly address this issue.

### Analysis

In accordance with our findings on Apanovitch's Claim V, we find this issue is without merit.  As previously discussed, Apanovitch has failed to demonstrate that he was entitled to habeas review on any of his claims.

### CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Apanovitch's grounds for relief.  The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right. *Slack v. McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court declines to issue a COA on Apanovitch's claims, which the Court found were not cognizable under habeas review. As discussed above, Apanovitch has failed to make a substantial showing of a denial of a constitutional right. He was unable to point to Supreme Court precedent recognizing a freestanding constitutional claim of actual innocence, a constitutional claim under *Brady* for

evidence developed after trial, a constitutional claim based on the Double Jeopardy Clause under the circumstances present in this case, or a constitutional claim for the state courts' alleged arbitrary application of state law.  Accordingly, no jurist of reason would debate the Court's conclusions on these claims.

## CONCLUSION

For the foregoing reasons, this Court denies Apanovitch's Petition for Writ of Habeas Corpus.  The Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith with regard to Claims I through VI, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.


   /s/ John R. Adams
JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE


DATED:   June 10, 2026